Filed 11/22/21  P. v. DeLeon CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JORGE DELEON,<br>Defendant and Appellant. | A159154<br><br>(San Francisco County<br>Super. Ct. No. SCN229759) |

Defendant Jorge Nicolla DeLeon, a "step-grandparent" to the grandchildren of his wife, was convicted on three counts involving crimes against three granddaughters, aged five, six, and 10:  continuous sexual abuse of two of the children and committing a lewd and lascivious act on the third.  The jury also found true multiple victim enhancements, and defendant was sentenced to consecutive terms of 25 years to life.

Defendant appeals, asserting nine arguments, including insufficient evidence for one count, improper admission of opinion evidence, instructional error, prosecutorial misconduct, ineffective assistance of counsel, and cruel and unusual punishment based on the length of his sentence.  We reject most of the arguments, but conclude, as the Attorney General concedes, that one item of expert testimony was improperly allowed, but that the error was harmless.  We also hold that the trial court erred in sentencing, wrongly

1

understanding it had no discretion but to impose the consecutive sentences. We thus remand for resentencing, but otherwise affirm.

## BACKGROUND

### The General Setting

Defendant was born in 1975, in Guatemala City. After moving to the United States, he finally settled in Hayward. In 2003, when he was 28, he began a relationship with Cristiana, a 48-year-old woman who had seven children and several grandchildren. Defendant and Cristiana moved into her house on San Bruno Avenue in San Francisco (the house), occupying a bedroom on the second floor. In 2006, they married, and defendant was at times below, and is in the briefing here, referred to as the "step-grandparent."

Over the years, defendant made some improvements to the house, which enabled some of Christiana's children to live there as well. One of those children was Sitti Mejia, who moved there with her husband Sean and their two children, a son Cristian, born in 2002, and a daughter S.M., born in 2004; a third child, a daughter, C.M., was born in 2008. Sitti, Sean, and the girls lived in an "in-law unit" inside the garage, which had a "living room of sorts" with a couch. Cristian lived in a separate room in the backyard.

Cristiana's son Andrew also lived in the house, occupying another upstairs bedroom. Andrew had a daughter, S.A., who lived with her mother Sheryl F., but would visit the house on weekends.

### The Child Abuse Investigation

In late April 2017, Child Protective Services (CPS) investigated a child abuse allegation against Sitti regarding S.M., an accusation that involved hair-pulling and a face slap. The investigation quickly morphed into a sexual abuse investigation targeting defendant, led by John Viet. He interviewed S.M., who initially denied any inappropriate contact by defendant, a

statement she would later recant. Viet advised Sitti to ask the younger C.M. about any inappropriate contact. She did, and C.M. complained that defendant had touched her inappropriately. Viet then conducted interviews with C.M. and S.M., interviews at which Sitti was present. Viet also spoke with Cristian, "because his sister had said he was there."

On May 1, the matter was referred to the Special Victims Unit, and Sergeant Tom Lee interviewed Sitti and Sean. The next day, May 2, Lee separately interviewed C.M., S.M., and Cristian. A few months later Lee received additional information from Sheryl, S.A.'s mother, and on July 26, he interviewed S.A.

**The Proceedings Below**

**An Overview**

On September 14, 2018, the District Attorney filed an information charging defendant with nine crimes, which was the information in place when trial began on July 17, 2019, with jury selection issues. Two days later, a first amended information was filed also alleging nine crimes, which was the information in place on July 24, when opening statements were given and the first witness testified. As will be seen, the operative information here, the second amended information, was not filed until July 30, the seventh day of trial.

Testimony began on July 24, with the testimony of Sergeant Lee, followed by C.M. and then S.M. The next day, July 25, was a half-day only, when the jury heard from Cristian, followed by an Evidence Code section 402 hearing. Trial was continued to July 29, which day began with brief testimony from S.A and the day ended with lengthy expert testimony from Dr. Anthony Urquiza, following which the People rested. That evidence included the following.

3

**The Evidence**

**C.M.**

C.M. was born in 2008, and was 10 years old at the time of trial. The first touching by defendant she remembered was when he touched her on her arms, legs, "butt," and "private," which she used to "go pee," which occurred when her parents and siblings went downtown, and she remained at the house with her grandmother and defendant. Specifically, she was lying on the bed in their room watching TV, when defendant "put his hand on top of [her] private part" on the skin and moved his hand around. C.M. testified "[i]t felt weird and uncomfortable," and she "wanted to say, 'Stop,'" but "was too scared," thinking defendant "might get mad, or [her grandma] might think [she] was lying." After defendant "was done with the private," he "flipped over his hand to [her] butt" and moved his hand "all around." As to when this occurred, C.M. said it was when she was "in kindergarten or first grade."

C.M. remembered another touching, this in the garage, when C.M. was "probably in first grade." While C.M.'s parents were in their room with the door closed, defendant ran his hand "up and down the side of her arm" while she was wearing a sleeveless nightgown. He did not touch her anywhere else, and no clothing was removed. And, C.M. added, defendant touched her in the garage "[m]ore than once."

As noted, C.M. testified the incident in defendant's bedroom occurred when she was "in kindergarten or first grade." She also testified defendant touched her on her "private" and "butt" more than five times from the end of kindergarten to second grade. She remembered the touching started in the summer but was "not sure" whether it was between kindergarten and first grade and could have been between first and second grade. She added that

4

the touching was over a period of several months—"probably like months," she said—though she also answered "yes" to the prosecutor's questions as to whether the touchings occurring in kindergarten, first, and second grade.

**S.M.**

S.M. was born in April 2004, and was 15 at the time of the trial. S.M. testified that when she was about eight years old, defendant started to touch her "in places where [she] didn't appreciate being touched," specifically, her "boobs," "butt," and "private part," that which she used "[t]o pee." S.M. was "positive" the touching happened when she was eight, nine, and 10 years old, and was "pretty sure it continued to when [she was] 11." S.M. could not remember the first- or second-time defendant touched her, explaining, "It just happened often in the same places. That's why, it's not something I want to remember, but it's something like . . . that's why I can't say I know I remember the very first time it started happening. But . . . if anything, all the times it did happen they were mostly the same, because they mainly happened in the same spots." As to the frequency of the touchings, S.M. testified, "It would happen many times. I can't give you an exact number because I [did not] count. I can tell you that, within those years that it happened, it was probably more than 10, probably more than 15, probably more than 20. Because it happened pretty often."

S.M. described several specific incidents, one of which happened in the upstairs kitchen. S.M., Cristian, two of her uncles, and perhaps her grandmother were there. She was away from the others, and defendant stood next to her, in back of her so that the others could not see. S.M. felt defendant put his hand in her pants and touch her "butt" inside her underwear with his bare hand for "probably less than a minute," and then squeeze her "butt." When defendant took his hand out, S.M.'s pants

5

"smack[ed]" or "snap[ped]" against her back. Cristian turned around and saw defendant next to her, and S.M. believed Cristian started to suspect something was going on because he asked her about the incident. S.M. denied anything had happened because she "felt he would have got mad, said something there," and she was "afraid of what could have happened."

Another time S.M. and her siblings were in the living room area in the garage. Cristian was on the computer, C.M. was watching TV, and she was standing and doing something with her phone. Defendant came downstairs, stood behind S.M. and rubbed "his private part" against her "butt" and breathed on S.M.'s neck and kissed it. Cristian looked up and defendant "backed away," saying "Oh, what are [you] doing on your phone?" in her view acting as if "he was interested in what [she] was doing, to play it off like he wasn't just doing the things he was doing."

S.M. recalled another incident that happened in the downstairs kitchen. Cristian was there, and she and C.M. were eating. Cristian was not going to eat with them but decided to stay when defendant walked in. S.M. wore a tank top, and she (and Cristian) saw defendant "trying to peek through [her] tank top." Defendant again tried to "[play] it off" by saying, "What are you guys eating?"

S.M. testified, albeit without specificity, about another incident where defendant put his hands under her underwear and on her "private part" on the skin. In S.M.'s words: "He would . . . just like rub it, like just touch it . . . . And he would just do that often—especially when there was no one, no adult around," going on to say, "It could be in the kitchen upstairs, in the kitchen downstairs; it could be in the garage. If there's no adults, he went for it." She later added that "[A] few times" defendant touched her with his hand over her clothes rather than "skin to skin."

6

The touchings happened many more times than the specific memories S.M. recalled. Defendant "tend[ed] to do the same kind of touching every time" where "he would touch [her] . . . either on [her] butt, on [her] private, or on [her] chest." There were times when defendant touched her in more than one place at a time, but S.M. could not "remember specifics." The skin to skin touching occurred about once a week over the course of years. S.M. testified she tried to forget the abuse, that she tried to "just black out" because it was "not something that [she] like[d] to think about."

S.M. testified she "wanted to say something but . . . couldn't." Asked, "And what do you think would happen if you told someone?" S.M. said, "I don't know what he's capable of doing. So I can't give you an exact answer. I was afraid that something could have happened to my sister and I or my brother or my parents; that I wouldn't want that." S.M.'s parents found out about the abuse around the end of April or beginning of May 2017.

S.M. said defendant "never talked about it when he did it," though one time he asked S.M. whether she had "told anyone about the stuff he did." This happened when S.M. and C.M. were about to shower, and defendant "peeked" his head into the bathroom and said "Did you tell anyone about . . . " not finishing the sentence. S.M. asked, "about what," and defendant pointed at her "boob" and "tapped it," and S.M. realized what he was talking about. S.M. said, "no," and defendant replied, "Okay," and left. "[A] little bit later," defendant knocked on the door and asked S.M., "Do you want money?" S.M. replied, "no," and defendant said, "No, I can give you money."

**S.A.**

S.A. was born in September 2009 and was nine at the time of trial. During the week she lived with her mother, but would visit her grandmother's house on weekends. However, she stopped visiting when she

7

was in the first grade because "something bad happened" in defendant's room—he "touched [her] private part," the part she used "to pee." S.A. said defendant told her not to tell anybody about the touching, and she complied because she "was scared [she] was going to get in trouble" with her mother and defendant.

S.A. testified she stopped visiting her father at the house because she did not want to see defendant. She did not tell her parents her reason for not going to the house "[b]ecause [she] wanted to forget it." When she thought about the incident, she felt "[s]ad."

**Cristian**

Cristian, the older brother of C.M. and S.M., corroborated much of their testimony. His first relevant memory was that he was watching TV with S.M., who was sitting on the couch. Defendant came downstairs and asked Cristian whether his parents were home; Cristian said, "no," and defendant remained downstairs. "[A]fter a little while," defendant sat next to S.M. and touched her inside her underwear in the back of her body. Cristian then heard a noise like the snap of S.M.'s underwear or pajamas.

Cristian testified that "[t]here [were] a lot of times that my little sister [C.M.] would come upstairs to eat. And when [defendant] was in the kitchen, there were four seats at the table and instead of my sister sitting at the other chairs [defendant] told [C.M.] to sit on his lap. And he was just shaking his leg or something while she was on his lap." Sometimes defendant shook both legs, sometimes just one. While Cristian could not "actually see [defendant's] penis," he "saw [defendant] position it in a way" where C.M.'s "bottom [was] on his [penis.]" Defendant's conduct bothered Cristian because he "knew what [defendant] was trying to do." Cristian explained, "It looked like he was

8

trying to put his [penis] on, I don't know, rub it . . . on her bottom. And it just looked like that to me."

When asked how often Cristian witnessed this behavior by defendant, Cristian answered, "It was most of the time my sister went upstairs to eat" or "sometimes it would be downstairs." C.M. was about five or six years old "when [Cristian] would see this," and "[i]t happened [for] years."

Another time, when Cristian and C.M. were in their grandmother and defendant's room, defendant "pulled down [C.M.'s] pants and . . . saw her butt. And then he [spanked] it" on the bare skin.

At other times Cristian saw defendant putting his hand in the back of S.M.'s pants. These incidents happened in "the garage or upstairs." One example he described was as he walked into the garage from the backyard, he saw defendant's arm "behind S.M." Cristian also witnessed defendant squatting behind the gate in the backyard recording S.M.'s legs with his phone as she rode a stationary bicycle wearing "short shorts." As soon as defendant saw Cristian on the other side of the gate, he got up, "said something [and] just put his phone away."

**Dr. Urquiza**

As noted above, on July 29, following S.A.'s testimony the People put on their final witness, expert Dr. Anthony Urquiza, who was on the stand for the balance of the day, over three hours. Dr. Urquiza's lengthy testimony was devoted to child sexual abuse accommodation syndrome (CSAAS), a theory that identifies behaviors of sexually abused children, testimony our Supreme Court has held " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*).) And we digress

9

momentarily from discussion of the trial testimony, to briefly discuss CSAAS evidence.

CSAAS evidence is not relevant to prove that the alleged sexual abuse occurred, and the expert providing CSAAS testimony may not give " 'general' testimony describing the components of the syndrome . . . to the facts of the case and conclude the child was sexually abused." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).) Nor is it proper for an expert to present "predictive conclusions" (*ibid.*), such as alleged child abuse victim "should be believed" or "abused children give inconsistent accounts and are credible nonetheless." (*Id.* at p. 394.) "The expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.) And admission of CSAAS testimony should not stray into opining on the unlikelihood of false testimony by child witnesses. (*People v. Julian* (2019) 34 Cal.App.5th 878, 885–886 (*Julian*).)

It is the case that some aspects of CSAAS are as consistent with false testimony as with true testimony, and thus the admissibility of CSAAS testimony must be handled carefully by the trial court. (*Bowker*, *supra*, 203 Cal.App.3d at pp. 391, 393; see *People v. Bledsoe* (1984) 36 Cal.3d 236.)

And finally on the issue of CSAAS testimony—and particularly pertinent to one issue here—is law that developed within months of the start of the trial here, which law emanated from two cases that involved testimony from Dr. Urquiza himself: *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*), filed on March 27, 2019, and *Julian*, *supra*, 34 Cal.App.5th 878, filed on April 29.

*Wilson*, a decision by our colleagues in Division Four, was a prosecution for 12 counts of lewd conduct against the daughter of Wilson's live-in girlfriend, in which Dr. Urquiza testified as to the infrequency of false

allegations of child sexual abuse. Surveying numerous cases nationally, both state and federal, our colleagues held that such testimony invaded the province of the jury, saying this: "Dr. Urquiza's testimony had the effect of telling the jury there was at least a 94 percent chance that any child who claimed to have been sexually abused was telling the truth. And, although Dr. Urquiza's testimony on this point was not expressly directed to either L.D. or J.D., the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' [Citations.]" (*Wilson*, *supra*, 33 Cal.App.5th at pp. 570–571.)

Our colleagues went on to find the admission of the evidence not prejudicial, as defendant had called his own expert in rebuttal. (*Wilson*, *supra*, 33 Cal.App.5th at p. 573.)

*Julian* involved a prosecution for four counts of lewd acts upon a child and one count of sexual penetration with a child under 10. Dr. Urquiza testified about CSAAS theory. (*Julian*, *supra*, 34 Cal.App.5th at pp. 882–883.) The Court of Appeal described what happened next:

"After presenting CSAAS evidence, the People introduced a new issue— the statistical percentage of false allegations by child sexual abuse victims. Urquiza testified false allegations by children 'don't happen very often.' '*The range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.*' (Italics added.) Julian's trial counsel did not object to this testimony. [¶] Urquiza testified one study showed that of the 4 percent of cases where there are false allegations, the 'largest subgroup' involved 'some type [of] custodial dispute.'

11

He also said that research bears out that false allegations are '*very infrequent, or rare.*' (Italics added.)" (*Julian, supra*, 34 Cal.App.5th at p. 883.)

Citing many of the same authorities as in *Wilson*, the Court of Appeal held that "[t]his statistical probability evidence deprived Julian of his right to a fair trial." (*Julian, supra*, 34 Cal.App.5th at p. 886.) In particular, citing to *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, the Court said: "At trial [in *Snowden*] an expert witness testified that 'child witnesses in sexual abuse cases tell the truth' 99.5 percent of the time. [Citation.] The court said, 'That such evidence is improper, in both state and federal trials, can hardly be disputed.' [Citation.] 'The jury's opinion on truthfulness of the children's stories went to the heart of the case.' [Citation.] 'Witness credibility is the sole province of the jury.' [Citation.] Allowing this expert testimony to 'boost the credibility of the main witness against [the defendant]' resulted in a 'fundamentally unfair' trial. [Citation.]" (*Julian*, at p. 886.)

The Court of Appeal went on to hold that by failing to object to such testimony, trial counsel provided ineffective assistance as there was no justification for the failure to object. And, the court concluded, the errors were prejudicial under any standard, and reversed and remanded for a new trial—this, despite the absence of an objection.

Though, as noted, *Wilson* and *Julian* were filed months before trial here, it would develop that defense counsel (admittedly) and the court and the prosecutor (evidently) were not aware of either case.

It was against this background that some 60 pages into his direct examination, Dr. Urquiza responded that he was "very familiar with the research on false allegations of sexual abuse, yes," adding that false

allegations by victims of child abuse occurred "very infrequently." The specific testimony was as follows:

"A. Well, first of all, false allegations of sexual abuse do occur, although . . . very infrequently.

"There is no body of research that supports the notion that false allegations of sexual abuse happen with any frequency with any sizable number.

"They do occur, I would say, very rarely. Infrequently do they occur."

The prosecutor then continued her examination regarding "the research" on "false allegations":

"Q. And so in the majority of cases, vast majority of cases, the research is what?

"A. With regard to false allegations?

"Q. Yes.

"A. First of all, understand that we're talking about a small number.

"It appears as though the largest subgroup for false allegations occurs in situations of some type of custodial dispute."

The prosecutor then asked "about . . . the argument that somebody could influence a child to make a false allegation?" Dr. Urquiza responded that it would be "incredibly difficult" to get a child to lie about something so significant. This is how he put it:

"But they have tried to get a child to do something sort of parallel to that and, for the most part, have been very unsuccessful.

"It is just an incredibly difficult thing to get a child to purposefully lie about something significant in their lifetime.

"I hate to say it is impossible, because there's not a lot of absolutes in the world, but it would be an incredibly difficult thing to do."

In short, as part of the prosecution's case-in-chief, Dr. Urquiza testified that the incidence of false reporting of child abuse by child-victims was very rare; that those false reports that did occur occurred primarily in child-custody disputes; and that children cannot be coached into false allegations.

Defense counsel's cross-examination only added to Dr. Urquiza's testimony. Asked if the incidence of false reporting was relatively small, Dr. Urquiza replied "Well, I would get rid of the 'relatively'." And later, after conceding there had been incidences of false allegations, he added "they have been fairly infrequent[ly]."

While, as noted, defense counsel (and apparently the court and the prosecutor) were unaware of the holdings in *Wilson* and *Julian*, Dr. Urquiza apparently was not, as on two occasions in the course of answering questions as to the statistics on false allegations, he twice paused before answering and "defer[red]" to the judge. This was the testimony:

"Q. All right . . . . Then the fifth characteristic of the syndrome is 'retraction?'

"A. Correct.

"Q. And that's, is that to say that a child may retract all or some of what was said—

"A. Correct.

"Q. —about being abused?

"A. Correct.

"Q. And is there a, say, percentage of incidence of retracted statements?

"A. There is a very good research study in which that happens to cite a percentage.

"I am gonna [*sic*] defer my answer to the judge, just to make sure that if I say a percentage it's okay with the judge, being able to provide an answer.

"THE COURT: Yes. You may go ahead, answer.

"THE WITNESS: Sure.

"The, probably one of the best studies that we have on retraction appears to indicate that somewhere in the range of 20 to 24 percent of kids who have been abused and disclosed take back the allegation. [¶] . . . [¶]

"Q. Is there a comparable way of determining what percentage of children who make false allegations retract them?

"A. I have that information but would again defer to the judge.

"THE COURT: Yes, you may answer.

"THE WITNESS: Okay.

"Um, there are about a dozen research studies looking at false allegations of sexual abuse.

"And of those dozen or so, there's a range from as low as about one percent of cases that are determined to be false, to as high [as] about six percent of cases that are determined to be false.

"So when I said earlier, when you asked me about that—and I think I probably said something like 'very infrequent' or 'rare,' I would really be talking about one percent to six percent."

Following Dr. Urquiza's testimony, the People rested.

**The Second Amended Information**

The next day, July 30, began with the People filing the second amended information. This information charged defendant with six counts: (1) continuous sexual abuse of S.M., a child under the age of 14 (Pen. Code,[1] § 288.5, subd. (a)); (2) committing a lewd and lascivious act upon S.M. (§ 288,

---

[1] All unspecified statutory references are to the Penal Code.

subd. (a)); (3) sexual penetration by foreign object of S.M., a child under the age of 14 and more than 10 years younger than defendant (§ 289, subd. (j)); (4) continuous sexual abuse of C.M., a child under the age of 14 (§ 288.5, subd. (a)); (5) committing a lewd and lascivious act upon C.M. (§ 288, subd. (a)); and (6) committing a lewd and lascivious act upon S.A., a child under that age of 14 (§ 288, subd. (a)). With respect to all counts except count 3, the information alleged that defendant committed the offenses against more than one victim. (§§ 667.61, subds. (b), (c), (e)(4), (j)(2), 1203.066, subd. (a)(7).)

**Defense Case**

Defendant's counsel made his opening statement, following which defendant took the stand, where he testified for some four hours. It began with testimony about various incidents in his childhood, beginning when he was age five, when his mother made him "kiss her boobs." One time defendant's teenage brother showed him a Polaroid picture of their naked mother. Another time his brother placed his penis on defendant's lips. And after defendant came to the United States (in December 1986) at age 11, a 16-year-old boy abused defendant when he was 14 years old by "penetrating" his anus "[b]y force."[2]

Turning to his relationship with Cristiana's family, defendant testified that once Sitti and her family moved in, there were "confrontations" where

---

[2] Defendant was asked by his counsel, "As a result of these things you've described for us, did you develop any personal feelings about children who were sexually abused?" He responded, "Yes," explaining, "How could somebody do that to somebody that look[s] up to you? It's not right, it's not right, where you no tell nobody. You ask yourself, 'Where is my mom? Where is my dad? Where is . . .' when they do all that. What would you do without these people?" Defendant believed children "should not be molested. They should be kids."

16

"sometimes they call[ed] the police." The confrontations took place between defendant and Sitti as well and one of Cristiana's sons. Defendant believed Sitti did not like him, and that the family talked about him in Tagalog, when he was around, knowing that he spoke only English and Spanish. Despite that, defendant tried his best to fulfill his role as a step-grandparent, testifying he especially cherished the gatherings in what he called the upstairs kitchen room.

As to his relationship with the children, defendant admitted to having occasional contact with the children, such as bouncing them on his knee, but denied anything sexual was taking place. And while he did not babysit either S.M. or C.M., and "seldom" went to the garage room with the television, he did often see the children at the home, especially upstairs with Cristiana present. C.M. would sit on his lap, he admitted, but he denied "touching her inside her pants." He also acknowledged that he touched her arms and legs, but such contact was not for sexual gratification.

Defendant denied touching S.M.'s private parts, expressly denying he put his hand in her pants in the upstairs kitchen. And he denied any "rubbing or squeezing" or that he snapped S.M.'s pajamas. He admitted he would hug S.M. around her arms and shoulders, but that such was not lewd conduct. He also admitted that from time to time he would look over S.M.'s shoulder at her phone, but denied that any such activity was a subterfuge to press his penis to her bottom. He also admitted that he did carry S.A.—"Of course I did," he said—but only appropriately and not with a lewd intent. And he specifically denied touching S.A.'s bottom or private part. In short, defendant denied committing the charged crimes.

To the contrary, he testified he had a good relationship with C.M. and S.M., and that he "tried to get close to them" and "to get along with them.

17

But there was always Sitti [i]n the way." According to defendant, Cristiana babysat S.M. and C.M. when their parents "were not around," but "you could count [those occasions] with your fingers on your hand, because Sitti was so protective of [C.M.]"

Defendant's testimony about one incident was enlightening. That is, he acknowledged he may have touched C.M.'s arm in the garage, but denied that he did so "with the intent of sexually arousing [him]self or her." Asked whether he had ever touched C.M.'s "private part and her butt more than five times," he recounted an incident in 2016 where Sitti asked him to help C.M. after she finished using the toilet. He said he refused, explaining, "But I knew better, I knew better not to do it. I knew better not to go there with [C.M.] Even though I could have, but I didn't, because it was not right."

Asked on cross-examination, "And what exactly would be wrong with helping a child in the bathroom? Wouldn't you say all adults help children in the bathroom?" defendant said, "All adults in the bathroom, yes, they do of course. But I didn't see it right. Because like I said, again, I was trying to save myself from being in [that] situation where I am right now." When asked, "So at the time you were thinking to yourself, 'I better not go in the bathroom to help [C.M.] so that she does not accuse me of child molestation?" defendant replied, "That was not on my head." The prosecutor continued, "Then why exactly didn't you go into the bathroom to help [C.M.]? Because you said the reason why you didn't go into the bathroom to help [C.M.] is because you didn't want to be in this situation?" Defendant replied, "Exactly. I could be wrongly accused for doing something that was normal."

Defendant's testimony about Sitti notwithstanding, he presented Sitti as a defense witness. Following her testimony, both sides rested, and trial was continued to August 1.

18

**The Verdict**

On August 1, counsel gave their arguments and following closing instructions the case was in the hands of the jury at 2:48 p.m. At 4:06 p.m. the jury announced it had a verdict, but had a question. The court answered the question at 4:15 p.m., and at 4:43 the jury returned its verdict, finding defendant guilty of continuous sexual abuse of S.M. and C.M. (counts 1 and 4), and committing a lewd and lascivious act on S.A., a child under the age of 14 (count 6.) The jury also found true the charged multiple victim enhancements. The jury made no findings on counts 2, 3, and 5, which had been charged in the alternative and those counts were later dismissed at sentencing.

**The Motion for New Trial**

On September 30, defendant filed a "non-statutory motion for new trial," based on the admission of the evidence held inadmissible by *Wilson* and *Julian*. It was accompanied by a declaration from defendant's counsel that acknowledged he did not object to the prosecutor's questions to Dr. Urquiza regarding false allegations of child sexual abuse and, in fact, during cross-examination asked follow-up questions regarding that topic. The declaration admitted counsel was unaware of the *Julian* decision until after Dr. Urquiza's testimony, and that he "became aware of the decision on September 4, 2019, when I was advised of it by another attorney with respect to an unrelated case." The declaration added that had counsel been aware of *Julian* he would have moved in limine to exclude Dr. Urquiza's testimony and would not have aggravated the prejudicial impact of such evidence by allowing him to expand on the matter in cross-examination. This evidence was, as in *Julian*, "inadmissible and . . . it deprived [defendant] of his right to

19

a fair trial." And, counsel acknowledged, his failure to object to this evidence constituted ineffective assistance.

The prosecutor filed opposition. Citing *Julian* and *Wilson*, the prosecutor conceded "that the statistical evidence mentioned by Dr. Urquiza should not have been admitted." However, she argued, defendant forfeited the issue by failing to object and in any event, "there is no reasonable probability that, absent the statistical evidence," the outcome of the trial would have been more favorable to defendant.

Defense counsel filed a reply, conceding that he forfeited his challenge to the complained-of testimony by failing to object to it. However, he urged, his failure "to pose such an objection constituted ineffective assistance of counsel and denied [defendant] a fair trial."

The motion came on for hearing on October 23, a lengthy hearing that resulted in a reporter's transcript of 24 pages. Among other things, the court noted that Dr. Urquiza's "testimony was relatively brief" and he "was not subject to the extensive direct, cross, redirect, recross that he testified to" in *Julian*. The court further noted that it "emphasized to [the jurors] that . . . it was their task to judge the credibility or believability of the witnesses." And the court continued, "The People focused their closing argument on the testimony of . . . the four minor witnesses, and emphasized to the jury they alone were the judges of the credibility of each of the witnesses. Having said that, even if Dr. [Urquiza's] testimony should not have been admitted, it wasn't objected to and therefore not admitted or limited in some way, I don't think that it would have changed the outcome of this case."

Defense counsel challenged the trial court's comments and attacked the credibility of the children's testimony. The court responded that "I think that the testimony of all those children was so overwhelmingly compelling and

20

credible," reiterating that even had defense counsel objected, the outcome of the trial would not have been different.

Responding, the prosecutor first commented on the incredible nature of defendant's testimony, and then noted that "neither the People nor the defense made any mention whatsoever of this statistical evidence including in arguments"—a comment with which defense counsel agreed.

At the conclusion of the hearing, the trial court denied the motion.

**The Sentence**

On November 8, defendant was sentenced to consecutive terms of 25 years to life for each of the sexual abuse counts (§ 288.5, (counts 1 and 4)), and a concurrent term of 25 years to life on the lewd conduct count (§§ 288.5, subd. (a), 667.61 (count 6)).

**DISCUSSION**

**Substantial Evidence Supports the Conviction for Continuous Residential Abuse of C.M. (Count 4)**

Defendant's first argument, couched in terms of claimed generic testimony, is in defendant's words that "where generic testimony is supplied, it must sufficiently differentiate between counts to ensure that the various *types* of unlawful conduct have in fact occurred and that the *number* of counts is supported," and that the "various acts described in C.M.'s testimony—lewd conduct combined with otherwise common grandparent contact—did not adequately differentiate lawful conduct from the proscribed three acts." Thus, there is no substantial evidence supporting defendant's conviction on count 4.

Our Supreme Court distilled the applicable law just two months ago, in *People v. Navarro* (Oct. 28, 2021, S165195) 12 Cal.5th 285, 302: " '[W]hen reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any*

21

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).) In doing so, we 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' (*People v. Reed* (2018) 4 Cal.5th 989, 1006 (*Reed*).) 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' (*People v. Flores* (2020) 9 Cal.5th 371, 411 (*Flores*).) We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence. (*Reed*, at p. 1006; see *id.* at p. 1007.)"

As that court has added on other occasions, "Reversal . . . is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) " ' "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Kelly* (1990) 51 Cal.3d 931, 956.)

Count 4 was, as noted, based on section 288.5, subdivision (a), which provides, "Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the

commission of the offense, as defined in subdivision (b) of section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in ection 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ."

Subdivision (b) of section 288.5, states, "To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number." And to establish a violation of section 288.5, "the prosecution need not prove the exact dates of the predicate sexual offenses in order to satisfy the three-month element.  Rather, it must adduce sufficient evidence to support a reasonable inference that at least three months elapsed between the first and last sexual acts.  Generic testimony is certainly capable of satisfying that requirement . . . ." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 97.)

That said, our Supreme Court has noted that "The victim, of course, must describe the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy).  Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping').  Finally, the victim must be able to describe the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." (*People v. Jones* (1990) 51 Cal.3d 294, 316, italics omitted (*Jones*).)

Such evidence was present here, C.M.'s testimony sufficiently specific with respect to the number and types of unlawful acts defendant committed within the statutory period.

As set forth in detail above, C.M. testified that defendant touched her on her arms, legs, "butt," and "private," going on to mark a diagram showing the body parts defendant touched. She described one specific incident in defendant's bedroom where he touched her "private part" and "butt," going on to testify he touched her "private" and "butt" "more than five times," from the end of kindergarten to second grade.[3]

C.M. described other incidents, including one time in the garage when defendant ran his hand "up and down the side of her arm" while she wore a sleeveless nightgown; another time defendant touched her leg while she wore a nightgown. And, she said, defendant touched her in the garage "[m]ore than once."

"More than five times"; more than "once" in the garage; and from the "end of kindergarten to second grade." In sum, C.M.'s testimony established that defendant repeatedly molested her for years during a time frame longer than the statutory three-month period.

Indeed, defendant's own brief might be said to concede the point, where, in its last argument as to cruel and unusual punishment, defendant attempts to minimize the nature of his crimes here, attempting to compare his conduct to that of the defendant in *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*). This is how defendant himself describes the record:

---

[3] She said the touching started in the summer, though she was "not sure" whether it was between kindergarten and first grade, and could have been between first and second grades.

"Nor is there any evidence that defendant planned to escalate his behavior beyond inappropriate touching—which, based on the testimony provided, included mostly over-the-clothes touching—or that he 'attempted [any] of the dangerous offenses sometimes associated with violations of section 288.' (*Rodriguez, supra*, 14 Cal.3d at p. 655.)

"The evidence of the duration of the touchings does not indicate such were extensive. Three instances were described by C.M.'s testimony: C.M. was lying on her grandmother's bed watching television. 'And he put his hand on top of my private part.' [Citation.] C.M. described the contact as 'on the skin,' and that he was 'moving around his hand.' [Citation.] During this episode [defendant] also touched her bottom, 'he was done with the private . . . flipped over his hand to my butt.' [Citation.] C.M. described a second touching that occurred in the garage/living room space that occurred while she [was] seated watching television and her parents were in the room. [Citation.] [Defendant] ran his hand up and down her arm while she was wearing a nightgown. [Citation.] This type of touching occurred 'More than once.' [Citation.] When [defendant] would touch her in the garage it was on the arms or legs, not C.M.'s privates. C.M. also generically described the touching by [defendant] when she was upstairs playing, 'A. I would usually be upstairs, playing with my cousins.' [Citation.] [¶] To C.M.'s own testimony was added that of her brother describing an act different from those described by C.M. herself. Cristian . . . testified at trial when he saw C.M. in [defendant's] lap at the dinner table, [defendant's] leg was bouncing, 'And he was just shaking his leg or something while she was on his lap. [Citation.] ['Sometimes both, sometimes one.'] This occurred multiple times. [Citation.]"

25

As defendant's acknowledgement indicates, C.M.'s brother Cristian supported C.M.'s testimony—and then some. He described various acts defendant committed, their frequency, and the general time frame in which they occurred. According to Cristian, "most of the time [C.M.] went upstairs to eat" and "sometimes . . . downstairs," defendant placed C.M. on his lap in such a way as to position his penis on her bottom and shook his legs. And Cristian said, "[i]t happened [for] years." Cristian also witnessed defendant spank C.M.'s bare butt, at one point saying he saw defendant molest C.M. "every time" he saw the children.

In sum, Cristian bolsters the credibility of C.M.'s testimony and provides additional details regarding other incidents of abuse. (See *Jones*, *supra*, 51 Cal.3d at p. 316 ["Additional details regarding the time, place or circumstances of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction"].)

In addition to all of the above, we note that defendant's argument is based on a myopic reading of the record, attempting to view the evidence in the light most favorable to him, perhaps best shown by the language of his argument, describing that the "various acts in C.M.'s testimony—lewd conduct combined with otherwise common grandparent contact—did not adequately differentiate lawful conduct from the proscribed three acts." "Otherwise common grandparent contact?" The evidence must be viewed otherwise. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)

## One Aspect of Dr. Urquiza's Testimony Was Improperly Admitted, But the Error Was Harmless

Defendant's second argument, to which he devotes over 20 pages in his brief, is that Dr. Urquiza's testimony about the infrequency of false reports deprived defendant of a fair trial.

By way of brief recap, Dr. Urquiza was allowed to answer questions about the supposed infrequency of false claims of sexual abuse, testimony that had recently been held inadmissible in *Wilson* and *Julian*. Defendant's counsel, admittedly unaware of the cases, did not object, and the trial court allowed Dr. Urquiza to answer. The People argue that defendant forfeited the claim in response to which defendant alternatively argues ineffective assistance of counsel.

As the People acknowledge, the evidence was improperly allowed, as it was in direct disregard of *Wilson* and *Julian*, as it would appear Dr. Urquiza himself knew. We conclude that the error was harmless, and thus could not be the basis of a successful ineffective assistance of counsel claim.

*Julian*, on which defendant most heavily relies, is distinguishable. In *Julian*, like here, defendant's counsel did not object to the evidence. The Court of Appeal nevertheless held that the claim was not forfeited in the circumstances there, circumstances that were a far cry from those here. The Court of Appeal described those circumstances:

"Urquiza used that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused. [Julian's] counsel's questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about a statistical certainty that defendants are guilty. (*In re Jones* (1996) 13 Cal.4th 552, 571.)

"Moreover, in closing argument, the prosecutor asked the jury to rely on Urquiza's statistical evidence that 'children rarely falsify allegations of sexual abuse.' He reminded jurors that Urquiza 'quoted a Canadian study for over 700 cases, *not a single one where there was a false allegation*.' (Italics added.) The claim that there is a zero percent chance children will fabricate abuse claims replaced the presumption of innocence with a presumption of guilt.

"In his closing argument, Julian's counsel discussed his position regarding Urquiza's testimony about the '12 studies,' the Canadian study, the Trocme & Bala study, a social worker study showing 'four percent or five percent' as false allegations, and the prosecutor's claim that 'false allegations are very rare.' When he discussed the statistical percentage of false allegations in a study called 'false allegations of sexual abuse of children and adolescents,' the prosecutor objected. The court stopped the argument for a 15-minute recess. When the jury returned, the court instructed jurors that there was 'a disagreement' by counsel about 'a certain study.' The jury should decide the issue based on the evidence introduced about the study, not what the lawyers remember about it. Consequently, the jurors' attention was directed, once again, to the statistical study evidence right before they began their deliberations." (*Julian, supra*, 34 Cal.App.5th at pp. 888–889.)

Here, by contrast, the complained-of testimony was never mentioned in any closing argument, as defense counsel conceded below at the hearing on the motion for new trial.

More specifically, in the prosecutor's opening argument, not one thing was said about Dr. Urquiza, his name never once mentioned.

Then, in defendant's closing argument, his counsel made three references to how the case was one of "she said, he said." Following that,

counsel made brief reference to Dr. Urquiza and CSAAS, ending his brief response with the statement that "his testimony was pretty much useless."

Against that background, the People's brief closing argument—10 pages of reporter's transcript in total—referred to Dr. Urquiza, but only to urge the jury his testimony was "helpful" and that, as the jury had been instructed, his testimony addressed issues of the children's "credibility."[4] This is what she said:

"So I think that his testimony was very important.  [¶]  And I think that counsel's comments regarding the credibility of witnesses regarding the statements were ignoring Dr. Urquiza's testimony.  [¶]  Their conduct, viewed in light of Dr. Urquiza's testimony makes a lot of sense.  [¶]  So I think it was very important to hear from an expert on these issues in terms of what common responses are."  Nothing was said about the infrequency of false reporting.

Unlike the situation in *Julian*, the prosecutor did not, as defendant's brief describes it, take "advantage" of the improperly admitted testimony.  As the trial court put it at the hearing on the new trial motion, Dr. Urquiza's "testimony was relatively brief" and he "was not subject to the extensive

---

[4] The jury had been instructed as follows with CALCRIM No. 1193:

"You have heard testimony from Dr. Anthony Joseph Urquiza regarding child sexual abuse accommodation syndrome.

"Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not the conduct of [C.M.], [S.M.] and [S.A.] was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

direct, cross, redirect, recross that he testified to" in *Julian.* The court noted that it "emphasized to [the jurors] that it was their task to judge the credibility or believability of the witnesses," and, the court continued, "The People focused their closing argument on the testimony of . . . the four minor witnesses, and emphasized to the jury they alone were the judges of the credibility of each of the witnesses." And the court added, "even if Dr. [Urquiza's] testimony should not have been admitted, it wasn't objected to and therefore not admitted or limited in some way, I don't think [the testimony] would have changed the outcome of this case," especially given what the court described as the children's testimony that "was so overwhelmingly compelling and credible."

On top of all that, we note that the jury announced it had a verdict one hour and 18 minutes after the matter was in their hands—this, after a seven-day trial. It was hardly a close case.

Our conclusion that the evidence was harmless beyond a reasonable doubt likewise defeats any ineffective assistance of counsel claim, as defendant could not prove one of the two requisite elements of such a claim, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; see *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [to obtain relief for ineffective assistance of counsel, defendant must establish prejudice].)

Contrary to defendant's assertion that the case "presented close issues of fact," as the trial court observed the children's testimony was "overwhelmingly compelling and credible," each child corroborating the others' testimony that demonstrated defendant was for years a serial sex abuser. By contrast, defendant's testimony was hardly credible, and

evidenced his consciousness of guilt. For example, on cross-examination defendant acknowledged that each of the children was "sweet," "respectful," and honest until May 2017, when they finally accused him of sexual molestation, an unexplained assertion that is difficult to believe. Defendant also made several bizarre statements on the stand that undermined his credibility, including testifying that he actively tried to avoid being accused of child molestation by not helping C.M. in the bathroom, not spending time with S.M. in the garage, and not changing S.A.'s diapers.

### The Trial Court Properly Instructed Regarding the Cross-Admissibility of the Charged Offenses

Defendant next argues that CALCRIM No. 1191B erroneously allowed the jury to consider any charged offense it found beyond a reasonable doubt as propensity evidence with respect to the other charged offenses, and thus deprived him of due process and lessened the prosecution's burden of proof.

By way of background, during the conference on instructions, the prosecutor asked the trial court to give CALCRIM No. 1191B.[5] Expressly recognizing that the instruction was proper under *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), defense counsel nevertheless objected "primarily for the purpose of preserving" defendant's right to appeal the issue. And, he

---

[5] CALCRIM No. 1191B reads as follows: "If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit [and did commit] the other sex offense[s] charged in this case.

"If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt."

added, "I would object on the grounds . . . that use of this instruction violates [defendant's] right to due process, is prejudicial to his defense, and impermissibly lessens the prosecution's burden of proof beyond a reasonable doubt with respect to any charge in which the jury relies upon this instruction to convict, because they had previously convicted or arrived at the conclusion, he should be convicted of one of the other charges. And I agree with Justice Corrigan's opinion that it basically allows the jury to bootstrap one count in front of another."

The prosecutor responded that the instruction was appropriate because "it explicitly states . . . that the People must still prove each charge and allegation beyond a reasonable doubt." And the trial court granted the request to include the instruction, explaining that the evidence was cross-admissible under the Evidence Code, with a lengthy explanation why.[6]

---

[6] This was the explanation: "I would also note here, having heard the testimony of the three victims in this case that, although their accounts of their respective attacks did have some differences, their version and the circumstances of their attacks were very similar in a number of different respects.

"All three of the victims were young girls under the age of 14;

"All three of the victims were the granddaughters by marriage, the step-granddaughters of the defendant;

"The attacks all occurred in the defendant's home;

"Two of the girls actually resided there. The other girl visited on occasion. She lived with her [mother];

"The touching was very similar that they each experienced or suffered through;

"And they were roughly within the same age range when the assaults occurred.

"So the evidence with respect to each event was highly probative of the defendant's propensity to commit the offense.

32

CALCRIM No. 1191B, the instruction on the cross-admissibility of charged sex offenses, does not violate due process or lower the prosecutor's burden of proof, as our Supreme Court made clear in *Villatoro*, in its discussion of the precursor to CALCRIM No. 1191B: "the instruction clearly t[ells] the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity. Thus, there [is] no risk the jury would apply an impermissibly low standard of proof." (*Villatoro*, *supra*, 54 Cal.4th at p. 1168.) Moreover, and as in *Villatoro*, the trial court here instructed with CALCRIM No. 220, "which defines the reasonable doubt standard and reiterates that the defendant is presumed innocent; it also explains that only proof beyond a reasonable doubt will overcome that presumption." (*Villatoro*, *supra*, 54 Cal.4th at p. 1168.) CALCRIM No. 1191B "did not impermissibly lower the standard of proof or otherwise interfere with defendant's presumption of innocence." (*Villatoro*, at p. 1168.)

Defendant does not dispute that each of the charged offenses were sexual offenses within the meaning of Evidence Code section 1108, subdivision (d)(1)(A).[7] Nor does he challenge the trial court's cross-admissibility analysis under the Evidence Code. Rather defendant maintains that cross-admissibility in this case deprived him of "his due process right to a fair trial" because "the jury was not instructed with" CALCRIM No. 3515,

---

"Any so its value substantially outweighs any prejudice with regard to [Evidence Code section] 352."

[7] Evidence Code section 1108, subdivision (a), provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by section 1101, if the evidence is not inadmissible pursuant to section 352." Subdivision (d)(1)(A) of Evidence Code section 1108, defines "sexual offense" as "a crime under the law of a state or of the United States that involved any of the following: [¶] Any conduct proscribed by . . . section . . . 288, . . . 288.5, or 289 of the Penal Code."

which provides, " 'Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one.' "  Thus, defendant maintains, "jurors were left to their own devices on whether the multiple offenses could be considered all at once in deciding whether [defendant] actually harbored lewd intent during any of the variously described contacts included in the continuous abuse allegations." And he goes on, "Where various acts may be confused as supplying the basis for a charge, instruction allowing jurors to apply conviction of one count as evidence of others dilutes the unanimity standard that the jury 'must consider each count separately and return a separate verdict for each one.' "

As defendant acknowledges, the trial court was not required to give CALCRIM No. 3515 sua sponte.  (*People v. Beagle* (1972) 6 Cal.3d 441, 456, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190 ["An instruction that the jury must decide each count separately on the evidence and law applicable thereto, uninfluenced by their verdict on any other count, need not be given in the absence of a request therefor"].) Defendant did not request the instruction, and thus forfeited his argument. (*People v. Jennings* (2010) 50 Cal.4th 616, 675 [where defendant fails to request instruction on which the court has no sua sponte duty to instruct, defendant forfeits claim of error on appeal].)

In any event, the argument is meritless.  The absence of CALCRIM No. 3515 did not lower the prosecution's burden of proof.

Contrary to defendant's unsupported statement, the jurors were not "left to their own devices."  Again, *Villatoro* is apt:  "It is . . . the jury's factual finding that defendant has committed a sex offense[] that the jury relies on to draw an inference of disposition or propensity.  Specifically, [CALCRIM No. 1191B] explained to the jury that if it decided defendant had committed a

charged sex offense, 'from that evidence' it could conclude that defendant had a disposition to commit the other charged sex offenses, and that based on that decision, the jury could also conclude that defendant was likely to and did commit the other charged sex offenses. [Citations.] Ultimately, the . . . instruction affirmed that evidence that the defendant committed a charged offense 'is not sufficient by itself to prove the defendant is guilty of another charged offense.' " (*Villatoro*, *supra*, 54 Cal.4th at p. 1165.) Nothing in CALCRIM No. 1191B invited the jury not to consider each count separately or not render a separate verdict on each count.

Defendant also asserts that "Use of cross-count propensity evidence in a case where multiple and various acts describe the basis for a continuing abuse charge strains Evidence Code section 1108 too far. Where generic testimony is used to describe conduct constituting an offense, testimony must still show 'the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct.' (*Jones*, *supra*, 51 Cal.3d at p. 316.)" And, he maintains, "Instructing jurors that they may apply evidence of the 'various types of proscribed conduct' across counts dilutes *Jones*' due process standard too far."

As the People point out, this argument confuses pretrial due process notice requirements for generic testimony (discussed in *Jones*) with claimed instructional error. It is unclear how, with evidence surviving pretrial scrutiny for sufficient specificity, CALCRIM No 1191B can dilute a due process standard the evidence has already met. (See *Jones*, *supra*, 51 Cal.3d at p. 318 ["given the availability of the preliminary hearing, demurrer and pretrial discovery procedures, the prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a

35

defendant's due process right to fair notice of the charges against him"].) And to the extent defendant contends generic testimony violates a defendant's right to a unanimous jury, *Jones* rejected that argument. (*Id.* at pp. 321–322.)

Defendant further asserts that CALCRIM No. 1191B was ambiguous and "allowed dilution of the burden of proof of the critical issue of whether lewd intent accompanied the various acts described as the basis for continuous abuse and lewd act counts." However, defendant did not request clarification of any claimed ambiguity, again resulting in a forfeiture. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 911 (*Covarrubias*) ["defendant's failure to seek amplification or further clarification of the standard instruction forfeits this issue on appeal"].) Furthermore, as discussed above, the instruction did not dilute the burden of proof with respect to the requisite lewd intent because it made clear that the People must prove each element, including intent, "beyond a reasonable doubt before [the jury] may consider one charge as proof of another charge." (*Villatoro*, *supra*, 54 Cal.4th at p. 1167.)

Finally, defendant asserts, without argument or authority, "the instruction as given tended toward court comment on the evidence" because it stated, "the People presented evidence that the defendant committed the crimes," suggesting that the instruction should have stated, " 'the People presented evidence *for the purpose of showing* that the defendant committed the crimes of . . . .' " Passing over that defendant did not request such language and thus forfeited the contention, (*Covarrubias*, *supra*, 1 Cal.5th at p. 911), the assertion is unsupported by argument or authority and is to be disregarded. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

In addition to all the above, any error in the instruction—and defendant has not demonstrated any—could not be reversible error, as even without cross-admissibility each victims' testimony was compelling. C.M. and S.M. testified that defendant touched them a sufficient number of times and within the requisite statutory period of time to satisfy sections 288 and 288.5. C.M. testified that defendant touched her "private" and "butt" "more than five times" from the end of kindergarten to second grade. S.M. testified that defendant touched her "boobs," "butt," and "private part" from ages eight to 11. And Cristian's testimony corroborated that defendant had lewd intent when he touched them.

### The Trial Court Properly Instructed Regarding the Intent Required for "Substantial Sexual Conduct" in the Context of Continuous Sexual Abuse

Defendant next argues that the trial court erroneously instructed the jury that "substantial sexual conduct" requires only general intent and, as we understand the argument, the conviction on count 1 cannot stand.[8]

By way of background, based on CALCRIM Nos. 225 and 251, the trial court instructed the jury in relevant part as follows:

"In evaluating the crimes charged in counts 1 and 4, each of which charges a violation of Penal Code section 288, subd[ivision] (a), if any of the three acts required to prove those charges are violations on Penal Code section 288, subd[ivision] (a), with respect to those acts, the People must prove not only that the defendant did the acts charged, but also that he acted with a *particular intent*. The instruction for Penal Code section 288, subd[ivision] (a), explains the intent required.

---

[8] He also suggests the prosecution improperly relied on penetration of S.M.'s labia majora rather than her vagina in proving "substantial sexual conduct."

37

"If one of the three required acts to prove the crime charged in count 1 is a violation of Penal Code section 289, subd[ivision] (j), with respect to that act the People need not prove that the defendant acted with a particular intent."

Thereafter, based on CALCRIM No. 1120, the court instructed the jury in relevant part that: "The defendant is charged in counts 1 and 4 with continuous sexual abuse of a child under the age of 14 years, in violation of Penal Code section 288.5, subd[ivision] (a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant lived in the same home with or had recurring access to a minor child;

"2. The defendant engaged in three or more acts of substantial sexual conduct or lewd or lascivious conduct with the child;

"3. Three or more months passed between the first and last acts;

"AND

"4. The child was under the age of 14 years at the time of the acts.

"Substantial sexual conduct means penetration of the child's vagina by any foreign object."

Discussing the continuous sexual abuse of S.M. during closing argument, the prosecutor stated, "The court mentioned substantial sexual conduct. That is not the theory that we are proceeding on. It's lewd or lascivious acts, so don't be confused about that." And in discussing the elements of count 3—sexual penetration in violation of section 289, subdivision (j)—the prosecutor noted, "Penetration of the genital opening refers to penetration of the labia majora, not the vagina." There was no instructional error.

38

"[S]ubstantial sexual conduct" in the context of a section 288.5 violation is "defined in subdivision (b) of section 1203.066." (§ 288.5, subd. (a).) And that subdivision states, " 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." "Substantial sexual conduct . . . does not require any kind of specific intent." (*People v Garcia* (2014) 229 Cal.App.4th 302, 312, fn. 3; see also *People v. Avina* (1993) 14 Cal.App.4th 1303, 1313 ["A conviction for section 288.5 . . . could be based upon a course of substantial sexual conduct within the meaning of section 1203.066, subdivision (b), which requires no specific intent"].)

In sum, "substantial sexual conduct" within the meaning of continuous sexual abuse does not require proof of specific intent. And in any event the prosecutor did not rely on "substantial sexual conduct" in proving count 1, her argument regarding penetration pertained to count 3—sexual penetration by foreign object—of which defendant was not convicted. Defendant's complaints regarding the type of penetration the prosecutor argued for count 3 are irrelevant to his claim of error with respect to count 1.

### Defendant's Claim of Prosecutorial Misconduct Was Forfeited, and the Alternative Claim of Ineffective Assistance of Counsel Has No Merit

As noted above, defendant's direct testimony included his describing various incidents of a sexual nature when he was a young person, including incidents involving his mother, his brother, and another person. Apparently based on that testimony, on cross-examination the prosecutor asked defendant: "And, sir, are you aware that two-thirds of child molesters report that they, themselves, were molested as children?" Defense counsel objected,

39

"Irrelevant, whether he knows that or not."  The court overruled the objection, and defendant answered, "I did not know that."

Defendant argues that the prosecutor committed misconduct by referring to facts not in evidence and asking an argumentative question; alternatively he argues trial counsel was ineffective if the issue was not preserved for appeal.  We conclude the argument was forfeited—and defendant's alternative argument has no merit.

" ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' "  (*Covarrubias*, *supra*, 1 Cal.5th at p. 894; *People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Here, defense counsel did not object on the grounds of misconduct, facts not in evidence, or argumentativeness.  Nor did counsel ask for the jury to be admonished.

Defendant acknowledges these failures, and also acknowledges the law requiring a defendant claiming prosecutorial misconduct to make a timely and specific objection and ask for an admonition.  (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.)  That law applies here, and any claim of prosecutorial misconduct claim is forfeited.

Defendant's alternative ineffective assistance claim fails because he does not demonstrate deficient performance or prejudice.  (*Strickland*, *supra*, 466 U.S. at pp. 687–688, 694.)  Where, as here, " 'the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus.' "  (*People v. Avena* (1996) 13 Cal.4th 394, 419, italics omitted.) Moreover, in attempting to demonstrate ineffective assistance, "[i]t is not

40

sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. Rather the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Blomdahl* (1993) 16 Cal.App.4th 1242, 1248, internal quotation marks, edit marks, and citations omitted.) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)

Here, the complained-of question did not "involve a critical issue" and was very brief, especially in the context of the entire trial record. The prosecutor did not belabor the point and moved on quickly. Counsel could reasonably have concluded that objecting on prosecutorial misconduct grounds and asking the court to admonish the jury would have unduly emphasized the complained-of question and drawn more of the jury's attention to it.

In any event, defendant fails to show prejudice. Indeed, defendant does not argue that the prosecutor's brief question was prejudicial by itself, but rather in cumulation with his other claims of error. But as discussed above, the evidence of defendant's guilt was overwhelming and cemented by his own testimony. So, even had counsel successfully objected to the prosecutor's fleeting question and the jury ordered to disregard it, there is no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland, supra*, 466 U.S. at p. 694.)

**The Trial Court Erred in Sentencing**

As noted, the trial court sentenced defendant to two consecutive 25 years to life terms, based on the convictions under counts 1 and 4 for

continuous sexual abuse.  In imposing the consecutive sentences, the court said:  "Further, pursuant to Penal Code [section] 667.61[, subdivision] (d), I am required to impose full separate consecutive sentences for defendant's convictions for violations of Penal Code [section] 288.5 in counts 1 and 4. Accordingly, I am imposing the required indeterminate term of 50 years to life for these two counts."[9]  Based on that, defendant's brief goes on for some 10 pages, and concludes that "one of the two life terms imposed must be stayed (§ 1260), or the matter remanded for resentencing."

While the Attorney General disagrees with defendant's "analysis," he does acknowledge that the trial court "incorrectly believed that consecutive sentencing was mandatory.  Accordingly, the matter should be remanded so that the trial court may exercise informed discretion.  Section 654 does not bar multiple punishment under the One Strike law based on the same multiple victim special circumstance, regardless of whether that punishment is consecutive or concurrent."

We agree, in light of which we need not address defendant's contention that his sentence, 50 years to life, constitutes cruel and unusual punishment. (See *People v. Williams* (1976) 16 Cal.3d 663, 667.)

Defendant's final contention, cumulative error, requires no discussion, as the only error was the improper admission of Dr. Urquiza's testimony about the infrequency of false reports, error that was harmless.

---

[9] Defendant's brief notes that although the reporter's transcript recites that the court referenced section "667.61[, subdivision] (d)," it is evident that the court may have intended to reference section 667.6, subdivision (d) because the subdivision (d) of section 667.61 list of more serious sex offense factors (e.g., kidnapping, torture) did not apply to the instant case, nor were any such subdivision (d) factors pleaded or proven.  (See, e.g., *People v. Mancebo* (2002) 27 Cal.4th 735.)  The Attorney General agrees with defendant's explanation.

42

## DISPOSITION

The matter is remanded for resentencing in accordance with section 667.6. In all other respects the judgment is affirmed.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.

*People v. Deleon* (A159154)